Filed 6/30/16  P. v. Avila CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069644 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1302266) |
| JULIO ESTEVAN AVILA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Ingrid A. Uhler, Judge.  Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Julio Estevan Avila appeals a judgment following his jury conviction of second degree murder (Pen. Code, § 187, subd. (a)).[1] On appeal, he contends: (1) he was denied his constitutional rights to remain silent, due process, and a fair trial when the trial court required him to testify as a condition to permit his argument he acted in self-defense; (2) he was denied his constitutional rights to due process, a fair trial, and present a defense when the court erred by instructing with CALCRIM No. 570 on voluntary manslaughter; (3) the prosecutor committed prejudicial error in arguing on the law of voluntary manslaughter and misstating the state of mind required for the heat of passion theory of voluntary manslaughter; (4) if he forfeited those prosecutorial errors by not objecting at trial, he was denied effective assistance of counsel; and (5) the cumulative prejudice of all the errors requires reversal of the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of July 7, 2013, Avila, Armando Lara, and other friends of Avila went to the home of Jefrey Camacho, smashed the windows of Camacho's car, and returned to Lara's house. At about 2:00 a.m., Camacho called his friend, Pablo Garcia, told him someone had broken his car windows, and asked him to come to his house. When Garcia arrived, Camacho got in Garcia's car and they drove to Lara's house to find Avila, whom Camacho suspected had caused the damage to his car.

On their arrival at Lara's house, they saw Avila standing outside with a group of about 10 people. Camacho and Garcia got out of their car and walked toward the group.

---

[1] All statutory references are to the Penal Code.

2

Garcia was carrying a baseball bat. They exchanged words with Avila and his group. Avila and Lara walked toward them. When Garcia and Camacho saw that Avila was holding a gun, they fled back to their car. Camacho got in the driver's seat and tried to drive away, but the parking brake had been engaged by Garcia on their arrival so Camacho struggled to get the car to move. As Camacho finally released the parking brake, Avila approached the driver's side window. Lara yelled, "Let him have it." Avila aimed the gun at Camacho and shot him in the back of his head.[2] Avila and Lara then fled in a friend's car. Avila stated he thought he had seen Camacho's head drop forward after he shot him. Garcia drove Camacho to a hospital, where he died.

An information charged Avila with one count of murder (§ 187, subd. (a)) and alleged that in committing the murder he personally used and/or discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (d). The jury found Avila guilty of second degree murder (§ 187, subd. (a)) and found true the firearm allegations (§ 12022.53, subds. (b)-(d)). The trial court sentenced Avila to an indeterminate term of 40 years to life in prison. Avila timely filed a notice of appeal.

---

[2] The bullet entered Camacho's head behind his left ear, passed through his brain, and exited through his right eye.

DISCUSSION

I

*Trial Court Did Not Require Avila to Testify*

Avila contends the trial court denied him his constitutional rights to remain silent, due process, and a fair trial when it required him to testify as a condition to his arguing he acted in self-defense. Because the record does not support his contention, we conclude the court did not so err.

A

During its case-in-chief, the prosecution presented the testimony of Garcia (Camacho's friend); Justin Johnson, Troy Scutella, and Robert Marquez (all detectives with the Ontario Police Department); and Bryan Espinoza and Isaac Casares (members of Avila's group the night of the incident). On conclusion of the prosecution's case, Avila moved to dismiss the first degree murder charge against him pursuant to section 1118.1, arguing the evidence presented by the prosecution was insufficient to support that charge. He argued the evidence instead supported a mutual combat theory and/or heat of passion theory. The court stated it did not believe there was evidence supporting a mutual combat theory. Avila then argued the evidence was insufficient for first degree murder because he perceived a threat when Camacho and Garcia got in their car and started to leave but then came back. In response, the court stated: "Well, we don't have any information actually at this point as to why the defendant shot the gun. That wasn't even elicited during the examination of the officer [who] conducted the interrogation of [Avila], so that is going to be pure speculation as to why he shot the gun. The only

4

evidence I do have is that I have numerous witnesses indicating that people were saying—I would assume it must be Armando Lara, but somebody at the location said, 'Let him have it! Let him have it!' numerous times." The court then cited testimony that would support a first degree murder finding. There was evidence showing Camacho and Garcia ran back to their car and were attempting to flee when Avila approached the car and shot Camacho, in a cold, calculated decision, on Lara's urging to "[l]et him have it." The court denied Avila's section 1118.1 motion to dismiss the first degree murder charge.

The court then inquired of Avila's counsel whether Lara and Avila would testify as part of the defense case. He replied Lara would testify. Regarding anticipated testimony by Avila, his counsel stated: "I guess if the Court's not going to allow me to argue self-defense without putting him on at this point, then I will put him on." The court commented: "Well, there are no factors of self-defense at this time." It then addressed Avila directly, stating: "So I just want to indicate, Mr. Avila, it's your choice. You have the absolute right not to testify and you have the absolute right to testify, so it appears that [your defense counsel] is indicating that you are going to make a choice to testify; is that correct?" Avila replied, "Yes, your Honor."

In the defense case, Avila's defense counsel presented the testimonies of Lara and Avila. The prosecution then recalled the three detectives for additional testimony.

B

Contrary to Avila's assertion, the record does not support a reasonable inference the trial court required him to testify as a condition to arguing self-defense. Rather, the substance of the court's ruling on Avila's section 1118.1 motion was that it found there

5

was substantial evidence to support a finding of first degree murder. (*People v. Stevens* (2007) 41 Cal.4th 182, 200 [in ruling on § 1118.1 motion to dismiss, trial court must review the record to determine " ' "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged" ' "].) In deciding Avila's section 1118.1 motion to dismiss, the court was not faced with deciding, and did not decide, whether Avila would be entitled to instructions on self-defense or heat of passion or to argue those theories to the jury.

After the court made its ruling on Avila's section 1118.1 motion, it inquired of Avila's counsel whether the testimonies of Lara and Avila would be part of the defense case. After confirming that Lara would testify, Avila's counsel stated: "I guess if the Court's not going to allow me to argue self-defense without putting [Avila] on at this point, then I will put [Avila] on." The court commented: "Well, there are no factors of self-defense at this time." Contrary to Avila's assertion, by its comment in response to his defense counsel's "guess"/inquiry, the court did *not* make any ruling that Avila had to personally testify in order to argue self-defense to the jury. Instead, the court simply made an observation, presumably based on its "off-the-cuff" recollection of the evidence presented during the prosecution's case-in-chief, that it was not aware of any evidence supporting a self-defense theory at that point of the trial. Despite Avila's apparent attempt to do so, the court's comment cannot be bootstrapped into a formal ruling that

6

Avila was required to personally testify in order to argue self-defense to the jury.[3]

Furthermore, we believe the court's comment was most likely an accurate one because it appears the prosecution's case-in-chief did not include sufficient evidence to support a self-defense theory. There was testimony that Garcia or Camacho may have had either a bat or a shotgun and also that Camacho and Garcia began to drive away in their car, but then backed up and/or returned. The trial court could have reasonably concluded that evidence was insufficient to support a finding that Avila shot Camacho in self-defense and Avila's counsel did not cite any other evidence in the prosecution's case-in-chief to show otherwise. We conclude the trial court did not require Avila to testify in order to make a self-defense argument and did not otherwise deny Avila his constitutional rights to remain silent, due process, and a fair trial. *People v. Cuccia* (2002) 97 Cal.App.4th 785, *People v. Lawson* (2005) 131 Cal.App.4th 1242, and the other cases cited by Avila are inapposite to this case and do not persuade us to reach a contrary conclusion.

---

[3] Even had the trial court made an implicit ruling that at that point of the trial the evidence was insufficient to support a self-defense theory, the ruling was not that Avila had to personally testify thereafter in order to argue self-defense. Instead, Avila could have presented (and ultimately did present) evidence during the defense case, other than his own testimony, that arguably could have provided substantial evidence to support a self-defense theory. The record shows Lara testified for the defense that after Camacho and Garcia left in their car, they put the car in reverse and backed up. Lara testified he and Avila then walked up to the car and saw the men in the car reaching behind and attempting to pull out a shotgun. Lara then cried out to Avila that they had a shotgun and told him to watch out. Lara's testimony, along with other testimony during the prosecution's case-in-chief that Camacho and Garcia may have had a shotgun in their car, might have provided sufficient evidence for the trial court to allow Avila to argue self-defense to the jury without his testimony.

## II

*Trial Court's Instruction with CALCRIM No. 570 on Voluntary Manslaughter*

Avila contends the trial court erred by instructing with CALCRIM No. 570 on voluntary manslaughter and, in so doing, denied him his constitutional rights to due process, a fair trial, and present a defense. He argues CALCRIM No. 570 did not adequately or properly instruct jurors regarding malice and the prosecutor's erroneous arguments regarding the differences between murder and voluntary manslaughter made the court's instructions prejudicially erroneous.

### A

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) Malice is express "when there is manifested a deliberate intention unlawfully to take away the life" of a human being. (§ 188.) "[Malice] is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) Murder that is willful, deliberate, and premeditated is murder of the first degree. (§ 189.)

In contrast to murder, "[m]anslaughter is the unlawful killing of a human being without malice." (§ 192.) Voluntary manslaughter includes the unlawful killing of a human being on a sudden quarrel or heat of passion. (§ 192, subd. (a).) "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" [citation], or when the defendant kills in "unreasonable self-defense"—the unreasonable

8

but good faith belief in having to act in self-defense [citations].' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)  Provocation can reduce an intentional killing from murder to voluntary manslaughter if the killer's reason was actually obscured as the result of a strong passion aroused by a provocation sufficient to cause an ordinary person to act rashly or without due deliberation and reflection and from that passion rather than from judgment.  (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)  A person who intentionally kills as a result of sufficient provocation (i.e., on a sudden quarrel or heat of passion) lacks malice and is guilty not of murder but of the lesser offense of voluntary manslaughter.  (*Lasko*, at p. 108.)

### B

A trial court must instruct the jury on general principles of law that are closely and openly connected to the facts and necessary for the jury's understanding of the case. (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Breverman, supra,* 19 Cal.4th at p. 154.)  On appeal, we generally review de novo the question of whether the trial court's instructions fully, fairly, and correctly state applicable law.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  In so doing, we consider the court's instructions as a whole and assume jurors are intelligent and capable of understanding and correlating all of the instructions.  (*Ibid.*)  We interpret the instructions, if possible, to support the judgment if they are reasonably susceptible to that interpretation.  (*Ibid.*)

### C

The trial court instructed with CALCRIM No. 520 on murder, stating:

9

"The defendant is charged in Count 1 with murder in violation of Penal Code Section 187.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant committed an act that caused the death of another person;

"2.  When the defendant acted, he had a state of mind called malice aforethought; and

"3.  He killed without lawful justification.

"There are two kinds of malice aforethought:  Express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with express malice if he unlawfully intended to kill.

"The defendant acted with implied malice if:

"1.  He intentionally committed an act;

"2.  The natural and probable consequences of the act were dangerous to human life;

"3.  At the time he acted he knew his act was dangerous to human life; and

"4.  He deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will towards the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time."

The court instructed with CALCRIM No. 570 on voluntary manslaughter, stating:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

10

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

11

The court also instructed with CALCRIM No. 200 that the jurors "must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

In closing argument, the prosecutor discussed the law on murder and voluntary manslaughter. She argued: "Voluntary manslaughter is murder with an excuse: 'I didn't intend to kill.' Sudden quarrel or heat of passion is one way to get to voluntary manslaughter." She also argued: "Once you find malice, there is no going to voluntary manslaughter."

D

To the extent Avila asserts the trial court's instructions on voluntary manslaughter, whether considered by themselves or together with the prosecutor's arguments, were erroneous because the instructions did not clearly state that even an intentional killing can be reduced to voluntary manslaughter, we conclude he forfeited or waived that purported instructional error by not requesting clarifying or amplifying language. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024; *People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1130.) In this case, because the court was not required to provide a pinpoint, clarifying, or amplifying instruction on an issue that was otherwise covered, whether expressly or implicitly, by the standard instructions (i.e., that an intentional killing may be reduced to voluntary manslaughter on a showing of sufficient provocation), Avila forfeited or waived any assertion that the instructions given were

12

ambiguous or incomplete by not requesting any clarifying or amplifying instructions. (*Lang*, at p. 1024; *Spurlock*, at p. 1130; *People v. Mayfield* (1997) 14 Cal.4th 668, 778; *People v. Cole* (2004) 33 Cal.4th 1158, 1211.)

E

Assuming Avila did not forfeit or waive the purported instructional error, we nevertheless conclude the trial court's instructions with CALCRIM No. 570 on voluntary manslaughter were correct statements of applicable law. In *People v. Genovese* (2008) 168 Cal.App.4th 817, the court addressed a similar contention and upheld the standard jury instructions on murder and voluntary manslaughter. *Genovese* rejected the defendant's argument that the trial court should have expressly instructed the jury that intent to kill or conscious disregard for life is an essential element of voluntary manslaughter. (*Id*. at p. 831.) It also rejected the defendant's alternative argument that the trial court's instructions did not inform the jury that voluntary manslaughter could be found despite the existence of an intent to kill or conscious disregard for life. (*Id*. at p. 832.) *Genovese* stated: "[A]lthough the jury was not expressly instructed in that manner, . . . the jury was instructed, 'A killing *that would otherwise be murder* is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.' " (*Id*. at p. 831.) The court explained: "The killing could not 'otherwise be murder' unless the jury found defendant intended to kill the victim or acted with conscious disregard for human life, and the jury was so informed in the instruction defining murder (i.e., that to prove murder, the prosecution must prove defendant acted with malice aforethought, and there are two kinds of malice aforethought—express,

13

which requires intent to kill, and implied, which requires conscious disregard for human life)." (*Id*. at pp. 831-832.) The court rejected the defendant's argument that, once the jury determined express or implied malice was present, it was not told it could still find the defendant guilty of voluntary manslaughter if it believed he acted in the heat of passion, noting the plain language of the instructions informed the jury that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant acted on a sudden quarrel or in the heat of passion. (*Id*. at p. 832.)

We agree with the reasoning in *Genovese* and apply it to the instructions given in this case. As in *Genovese*, the trial court here instructed a killing "that would otherwise be murder" is reduced to voluntary manslaughter if the defendant killed a person on a sudden quarrel or in the heat of passion and that the killing could not "otherwise be murder" unless the jury found the defendant either had intended to kill the victim or acted with conscious disregard for human life. Therefore, the court's instructions correctly informed the jury that a killing on a sudden quarrel or in the heat of passion, whether intentional or in conscious disregard for human life, is voluntary manslaughter. To the extent the prosecutor's closing argument conflicted with the court's instructions, the court instructed with CALCRIM No. 200 that the jury must follow its instructions and we presume the jury understood and followed the court's instructions. (*People v. Morales* (2001) 25 Cal.4th 34, 47; *People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) We conclude Avila was not denied his constitutional rights to due process, a fair trial, and present a defense when the court instructed with CALCRIM No. 570 on voluntary manslaughter.

14

## III

### *Prosecutorial Error*

Avila contends the prosecutor committed prejudicial error by arguing in closing on the law of voluntary manslaughter and misstating the state of mind required for the heat of passion theory of voluntary manslaughter.

### A

In closing, the prosecutor discussed the elements of murder and voluntary manslaughter. She argued: "Voluntary manslaughter is murder with an excuse: 'I didn't intend to kill.' Sudden quarrel or heat of passion is one way to get to voluntary manslaughter." She also argued: "If there is insufficient provocation, it's murder. And you have to determine whether or not you found insufficient provocation, assuming that you don't find malice. Once you find malice, there is no going to voluntary manslaughter." As Avila notes, the prosecutor also argued: "[W]hen you have malice, you have murder. When you don't have malice, that's when you have the lesser-included offense of voluntary manslaughter. . . . If you have no malice, that's the only way you can get to manslaughter." Avila asserts that in so arguing, the prosecutor erred by, in effect, telling the jury that once it found malice (i.e., intent to kill or act with conscious disregard for human life), it could not consider voluntary manslaughter.

The prosecutor also argued in closing that sudden quarrel or heat of passion was "sufficient provocation by the victim where a reasonable person would do the same thing that the defendant did under those circumstances." She further argued the evidence did not support voluntary manslaughter because Avila was not sufficiently provoked under

15

the reasonable person standard. Avila asserts that in so arguing, the prosecutor erred by misleading the jury that the reasonable person standard for sufficient provocation was whether a reasonable person would have acted as Avila did instead of the correct standard of whether a reasonable person in the same situation and knowing the same facts would have acted rashly and reacted from passion rather than from judgment.

B

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales, supra* 25 Cal.4th at p. 44.) To preserve a claim of prosecutorial misconduct or error, a defendant must timely object and request a curative admonition unless an admonition would not have cured the harm caused by the misconduct or error. (*People v. Hinton* (2006) 37 Cal.4th 839, 863; *People v. Earp* (1999) 20 Cal.4th 826, 858.)

C

Although Avila asserts the prosecutor erred by misstating applicable law regarding voluntary manslaughter and the reasonable person standard for provocation, the record shows, and he concedes, his counsel did not make timely objections to the purported prosecutorial errors and did not request curative admonitions. Avila does not persuade us that timely objections would have been futile or that admonitions could not have cured

16

the purported errors. We conclude Avila has forfeited or waived his claims of prosecutorial error and cannot raise them on appeal.[4] (*People v. Hinton*, *supra*, 37 Cal.4th at p. 863; *People v. Earp*, *supra*, 20 Cal.4th at p. 858; *People v. Jenkins* (2000) 22 Cal.4th 900, 1023; *People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Najera* (2006) 138 Cal.App.4th 212, 224.)

IV

*Ineffective Assistance of Counsel*

Avila contends that if he forfeited the above purported prosecutorial errors by his counsel not timely objecting to the errors and requesting curative admonitions, he was denied his constitutional right to effective assistance of counsel.

A

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422 (*Pope*).) To show denial of the right to counsel, a defendant must show: (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217

---

4    Because we concluded above the trial court correctly instructed with CALCRIM No. 570 on voluntary manslaughter and Avila does not persuade us otherwise, we reject his assertion he can raise the issue of prosecutorial error, despite his counsel's failure to timely object or request curative admonitions, based on section 1259 or cases involving instructional error (e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7).

(*Ledesma*); *Pope*, at p. 425.) To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had his or her counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, at p. 695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.) It is the defendant's burden on appeal to show that he or she was denied effective assistance of counsel and is entitled to relief. (*Ledesma*, at p. 218.)

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citations.] . . . Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Frye* (1998) 18 Cal.4th 894, 979-980.)

However, a court need not address the issue of whether a defendant's counsel performed deficiently before it addresses the issue of whether the defendant was prejudiced by that purported deficient performance. "If it is easier to dispose of an ineffectiveness claim on the ground of a lack of sufficient prejudice, which we expect

18

will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697; see also *In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

B

Assuming Avila's counsel performed deficiently as Avila asserts, we nevertheless conclude he has not carried his burden on appeal to show that such deficient performance prejudiced his case. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692, 697; *Ledesma*, *supra*, 43 Cal.3d 171, 216-217; *Pope*, *supra*, 23 Cal.3d at p. 425.)

*Law on voluntary manslaughter*. Regarding his counsel not objecting to and not requesting curative admonitions to the prosecutor's purported misstatements of the law on voluntary manslaughter, our review of the record shows it is not reasonably probable Avila would have obtained a more favorable verdict had his counsel objected to those misstatements and requested curative admonitions. First, as we concluded above, the trial court correctly instructed with CALCRIM No. 570 on voluntary manslaughter. The court instructed: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." To the extent the prosecutor's closing argument conflicted or was inconsistent with the court's instructions on the law applicable to voluntary manslaughter, the court instructed with CALCRIM No. 200 that the jury must follow its instructions and we presume the jury followed the court's instructions. Had Avila's counsel objected to the prosecutor's misstatements and requested curative admonitions, the jury would not have changed its application or understanding of the law on voluntary manslaughter. In both situations, the jury would have followed, and presumably did follow, the

19

instructions given it by the court and not any conflicting or inconsistent arguments by the prosecutor.

Second, the evidence in support of a voluntary manslaughter theory was much weaker than the evidence in support of murder. In support of voluntary manslaughter, there was evidence Camacho arrived with a shotgun, but put it back in the car when Avila told him to do so. Avila and Lara testified there was no physical altercation or fight. Rather, Camacho got back into the car and started to drive away. Avila testified the car then backed up and returned, causing him to be concerned for his safety. Avila testified he shot into the driver's door when he saw the car's driver reach for the shotgun in the backseat, causing him to be scared and feel his life was in danger. Lara also testified he saw someone in the car reaching for the shotgun in the backseat. Lara then told Avila to "[l]et him have it" because the shotgun scared him. Although that evidence may have provided some support for an inference that a reasonable person would have been provoked and acted rashly in that situation and, based thereon, a finding of voluntary manslaughter, the evidence in support of murder was much stronger and even overwhelming.

The evidence supporting the jury's finding of second degree murder included evidence showing Camacho and Garcia were armed only with a baseball bat and not a shotgun and, after the verbal confrontation with Avila and his group, had returned to their car to leave. However, Camacho had difficulty getting the car to move because its parking brake was engaged. Avila approached the car, Lara told him to "[l]et him have it," and Avila shot Camacho in the back of the head about the time the brake was

20

disengaged. That evidence overwhelmingly supported the jury's finding of murder and refuted Avila's voluntary manslaughter theory that he was provoked and acted rashly by shooting Camacho. Therefore, it is not reasonably probable the jury would have found Avila guilty of only voluntary manslaughter had his counsel objected to the prosecutor's misstatements regarding the law of voluntary manslaughter and requested curative admonitions. Contrary to Avila's assertion, the fact the jury did not find he acted with deliberation and premeditation in killing Camacho does not show it believed he acted based on provocation. Also, the fact the jury deliberated for seven days does not show it was a close case in its deliberations between second degree murder and voluntary manslaughter. Rather, the length of the jury's deliberations could very well have been the result of disagreements among jurors whether the murder was of the first degree rather than second degree.

*Reasonable person standard for provocation.* Regarding Avila's counsel not objecting to, and requesting admonitions to cure, the prosecutor's purported errors by arguing that the reasonable person standard for sufficient provocation was whether a reasonable person would have acted as Avila did, our review of the record shows it is not reasonably probable Avila would have obtained a more favorable verdict had his counsel objected to those errors and requested curative admonitions. First, as we concluded above, the trial court correctly instructed with CALCRIM No. 570 on voluntary manslaughter. The court instructed in pertinent part:

> "The defendant killed someone because of a sudden quarrel or in the
> heat of passion if:

21

"1.  The defendant was provoked;

"2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and

"3.  *The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.* [¶] . . . [¶]

"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient.  *In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. . . .*"  (Italics added.)

To the extent the prosecutor's closing argument conflicted or was inconsistent with the court's instructions on the law applicable to voluntary manslaughter and the reasonable person standard for provocation, the court instructed with CALCRIM No. 200 that the jury must follow its instructions, which we presume the jury did.  Therefore, had Avila's counsel objected to the prosecutor's misstatements and requested curative admonitions, the jury would not have changed its application or understanding of the law on voluntary manslaughter or the reasonable person standard for provocation.  In both situations, the jury would have followed, and presumably did follow, the instructions given it by the court and not any conflicting or inconsistent arguments by the prosecutor.

The evidence in support of a voluntary manslaughter theory was much weaker than the strong evidence in support of the jury's finding of murder.  We incorporate herein, without repeating, our discussion above of the evidence supporting voluntary manslaughter and the evidence supporting murder.  The evidence overwhelmingly

22

supported the jury's finding of murder and refuted the voluntary manslaughter theory that Avila was provoked and acted rashly by shooting Camacho, and that a reasonable person would have been provoked and acted rashly in that situation. Therefore, it is not reasonably probable the jury would have found Avila guilty of only voluntary manslaughter had his counsel objected to the prosecutor's misstatements regarding the reasonable person standard for provocation and requested curative admonitions. Contrary to Avila's assertion, the fact the jury did not find he acted with deliberation and premeditation in killing Camacho does not show it believed he acted based on provocation. Also, the fact the jury deliberated for seven days does not show it was a close case between second degree murder and voluntary manslaughter. Rather, the length of the jury's deliberations could very well have been the result of disagreements among jurors whether the murder was of the first degree rather than second degree.

*Conclusion.* Based on our review of the evidence, we conclude it is not reasonably probable Avila would have obtained a more favorable verdict had his counsel not performed deficiently as Avila asserts by not objecting to the prosecutor's purported misstatements on the law that applies to voluntary manslaughter and the reasonable person standard for provocation. Alternatively stated, our confidence in the outcome of Avila's trial is not undermined by the purported deficient performance of his counsel. Because Avila was not prejudiced by his counsel's purported deficient performance, he was not denied his constitutional right to effective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692, 697; *Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; *Pope*, *supra*, 23 Cal.3d at p. 425.)

V

*Cumulative Prejudice*

Avila contends the cumulative prejudice of the errors he asserts requires reversal of the judgment. However, based on our review of the record, we conclude there is no prejudicial error, considered individually or cumulatively, under the federal and state Constitutions. (Cf. *People v. Anderson* (2001) 25 Cal.4th 543, 606.)

DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

AARON, J.

24